## AMERICAN SEALCONE CORPORATION v. SYLVAN SEAL MILK, Inc.

Civil Action No. 783.

District Court, E. D. Pennsylvania.

Dec. 19, 1941.

Albert S. Longbottom, of Byron, Longbottom, Pape & O'Brien, of Philadelphia, Pa., for plaintiff.

Daniel Lowenthal and James J. O'Brien (of Fox, Rothschild, O'Brien & Frankel), both of Philadelphia, Pa., for defendant.

BARD, District Judge.

This is an action for breach of a written agreement entered into January 28, 1932, under which plaintiff leased to defendant certain patented machines to be used for the manufacture of paper containers known as "Sealcones" for packaging and distributing milk and other dairy products.

The plaintiff alleges that the defendant has breached the contract in (1) discontinuing the use of plaintiff's machines and using other machines during the term of the contract; (2) reporting and paying royalties since January 1, 1934, on the number of "Sealcones" sold instead of the number produced; and (3) failing to keep the machinery in good and efficient working condition.

The answer denies that the defendant is under any obligation to continue to use plaintiff's machines for making paper containers, asserts that the payment of royalties on the number of "Sealcones" sold, rather than on the number produced after January 1, 1934, was in conformity with an oral modification of the original agreement, and alleges that the machinery was, and is, in good and efficient working order.

I make the following special findings of fact:

1. The plaintiff, American Sealcone Corporation, is a New York corporation and is engaged in the business of manufacturing machinery for making paper containers for milk and other dairy products.

2. The defendant, Sylvan Seal Milk, Inc., is a Delaware corporation and is engaged in the business of pasteurizing, packaging and distributing milk and other dairy products in and near the city of Philadelphia.

3. The amount in controversy is in excess of $3,000.

4. On or about January 28, 1932, plaintiff and defendant entered into a written agreement by which plaintiff leased to defendant patented machines for the manufacture of containers (known as "Sealcones") for milk and other dairy products for a period extending until the expiration of the last patent thereon, in 1955.

5. As consideration for its use of plaintiff's machines, defendant agreed to pay, and did pay, an initial license fee of $72,500, plus specified royalties on the number of "Sealcones" produced by it.

6. Paragraph 1 of this agreement, which is the agreement upon which this action is based, provided, inter alia: "The Lessor agrees to lease and hereby does lease to the Lessee the property hereinafter described and agrees to license and hereby does license the Lessee to use the same, exclusively, however, (except as hereinafter provided) for the use in the Lessee's business of packaging, selling and distributing milk, cream * * *."

7. On the same day on which the licensing agreement was executed, January 28, 1932, plaintiff and defendant entered into a second written agreement by the terms of which plaintiff agreed to give defendant the exclusive right to manufacture containers with the leased machines in a designated territory, provided that the royalties paid by the defendant to plaintiff were of a specified minimum amount and that defendant did not use any other packaging machines to the extent of more than 5% of its total business. The agreement further provided that in the event the defendant failed to meet these conditions, the exclusive right of defendant to use the machines in the areas designated would be terminated ipso facto, but the defendant would continue to have the right to operate the machines under the license granted in the first agreement between the parties.

8. The conditions which were prerequisite to bringing this second written agreement into operation and effect were never met.

9. On or about March 30, 1939, defendant completely discontinued the use of plaintiff's machines and since then has been using other machines for the manufacture of its containers.

10. Up until January 1, 1934, defendant paid royalties on all "Sealcones" produced, with the exception of those returned on week-ends, for which it was given credit by plaintiff.

11. On or about January 10, 1934, plaintiff and defendant orally modified their written agreement so that thereafter defendant should be required to pay royalties only upon its net sales of "Sealcones" and not on all "Sealcones" produced by it.

12. Thereafter for more than five years defendant reported only its net sales of "Sealcones" and paid royalties thereon without objection by the plaintiff.

13. Paragraph 5 of the original agreement of January 28, 1932, provided, inter alia: "The Lessee will, at all times and at its own expense, keep the leased machines in good and efficient working order and condition * * *."

14. On March 30, 1939, the leased machines were in good and efficient working order.

15. The defendant has dismantled and stored the leased machines, and the cost of putting them in good and efficient working condition is $800.

16. On September 21, 1939, defendant unconditionally offered to return the leased machines to the plaintiff.

17. On September 21, 1939, plaintiff notified defendant of its intention to terminate the agreement unless defendant remedied its alleged breaches thereof within thirty days, but plaintiff never declared the contract terminated.

### Discussion.

The principal question of law presented is whether the agreement upon which this action is based required defendant to use plaintiff's machines, to the ex-

clusion of any others, for manufacturing containers for its products during the term of the agreement. The provision of the agreement relied upon by plaintiff to support its contention is to be found in paragraph 1 thereof, which recites that plaintiff leases its machines to defendant and licenses defendant "to use the same, exclusively, however, (except as hereinafter provided) for the use in the Lessee's business of packaging, selling and distributing milk * * *."

This provision does not require defendant to use the plaintiff's machines and no others. It licenses defendant to use such machines, but requires the defendant "to use the same, exclusively, however, * * * for the use in the Lessee's (defendant's) business, * * *" i.e., defendant could not supply a third party with "Sealcones" made on plaintiff's machines. This is the only construction consistent with the setting off of the word "exclusively" by commas, and with the use of the word "however".

Moreover, that this language was not inadvertent is shown by a clause in the second agreement made on the same day as the agreement in suit, in which the defendant clearly agreed to use the plaintiff's machines, and no others, for the manufacture of its containers (except for a stipulated 5% leeway). Under the terms of this second agreement, however, defendant's failure to use plaintiff's machines exclusively (and to meet certain other terms) resulted only in the loss of the exclusive license granted by this second agreement to use plaintiff's machines in a designated territory, and in no way affected the provisions of the original agreement under which defendant had only a non-exclusive license.

■ Plaintiff offered testimony as to the oral negotiations leading up to the execution of the agreement upon which suit is based for the purpose of "explaining" the meaning of the word "exclusively" as used therein. Such testimony is unavailing because it is inconsistent with, and would contradict rather than explain, the expressed intention of the parties in their written agreement. Gianni v. R. Russell & Co., Inc., 281 Pa. 320, 126 A. 791; Colonial Mfg. Co. v. Carideo, 142 Pa.Super. 485, 16 A.2d 731.

■ Since, therefore, defendant did not promise or agree to use plaintiff's machines exclusively, it committed no breach when it discontinued their use and began using other packaging machines. Plaintiff urges, however, that there should be read into the agreement an implied promise by the defendant to use the plaintiff's machines so as to earn the stipulated royalties and relies on the principle that the assumption of an exclusive agency is an assumption of its duties. Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214. In the case at bar, however, defendant was not granted an exclusive agency to use the plaintiff's machines. Moreover, there is no reason to imply a promise such as plaintiff contends for in this case. Plaintiff did not rely on the royalties as its sole compensation, but took the precaution of demanding and receiving an initial license fee of $72,500 for the use of its machines. Nor did it stipulate for minimum royalties. The obligations of the defendant to the plaintiff were clearly expressed in the agreement and there is no basis for implying what would have been expressed if intended.

Accordingly, plaintiff's claim for royalties on the packages manufactured by defendant since March 30, 1939, on machines other than those of the plaintiff, is denied.

■ Plaintiff's second claim is for an accounting for royalties on all "Sealcones" produced by the defendant since January 1, 1934. It is admitted that by the agreement of January 28, 1932, defendant was required to pay royalties on all "Sealcones" produced by it, and defendant further admits that since January 1, 1934, it has accounted for and paid royalties on only its net sales. It asserts, however, that this was in full accordance with an oral modification of the written agreement. Defendant's testimony as to the oral modification is corroborated, inter alia, by the following facts: Shortly after the execution of the original agreement, its terms were modified to the extent that defendant was given credit for the number of "Sealcones" returned over the week-end. Accordingly, its statements showed the credits claimed for these week-end returns. From and after January 1, 1934, however, no credit was taken for these returns, thereby indicating that some change had taken place. Plaintiff has no explanation of this fact other than that the defendant failed to claim credits after that date. On May 1, 1935, defendant sent a letter to plaintiff in which, upon request of the plaintiff, defendant reconciled its production figure with the figure for its net

sales, on which it had reported royalties were due. This letter unequivocally shows that the defendant was at that time making payments on only its net sales, yet for almost five years thereafter plaintiff accepted without objection or complaint such returns from the defendant. I find that there was an oral modification of the agreement by which after January 1, 1934, defendant was obliged to pay royalties on only its net sales and that these royalties were paid to the plaintiff.

■ The remaining question is whether defendant has breached its covenant to keep the leased machines in good and efficient working order. The testimony shows that the machines were in good and efficient working order on March 30, 1939, the date when defendant ceased to operate them. Thereafter, without plaintiff's consent or authority, the machines were partially dismantled and were stored by the defendant. On September 21, 1939, defendant for the first time made an unconditional offer to return the machines to plaintiff. This offer was never accepted by the plaintiff, which on the same day wrote a letter giving defendant thirty days within which to remedy its alleged breach of the agreement. Although defendant did not comply, plaintiff appears never to have declared the agreement terminated. Defendant has breached the agreement in that it has not maintained the machines in good and efficient working order. I find that the cost of restoring the machines to such condition is $800.

■ There is, therefore, presented a peculiar situation. Defendant has failed to maintain the machines in good and efficient working order. It is not, however, obliged to continue to use them and obviously does not intend to do so. Plaintiff, on the other hand, contends that there is a market for the sale or rental of these machines even though considerable expense might be required to render them marketable. If this be true, to permit the machines to remain idle for a period of four-teen years would appear to be sheer economic waste and would serve no equitable purpose. But I cannot compel the plaintiff to accept their return. Until the return of these machines, however, plaintiff has suffered no ascertainable damage. Accordingly, if the plaintiff elects at the present time to terminate the agreement and accept the tendered return of the machines by the defendant, I will assess damages against the defendant in the sum of $800; otherwise, plaintiff is entitled to no damages in the present action.

## Conclusions of Law.

1. Defendant is not required under the terms of the agreement in suit to use plaintiff's machines, to the exclusion of any other machines, for the manufacture of the containers for its products.

2. There is no implied agreement by defendant to continue to use plaintiff's machines during the entire term of the lease so as to earn royalties for plaintiff and "make productive the subject matter of the lease."

3. Plaintiff is not entitled to an accounting for royalties on the packages made by defendant on machines other than plaintiff's.

4. By oral modification of the original agreement between the parties defendant was required to pay royalties on only its net sales of "Sealcones" subsequent to January 1, 1934.

5. Defendant has failed to keep the leased machines in good and efficient working order as required by its agreement with plaintiff.

6. Plaintiff is entitled to damages in the amount of $800 if it elects to accept the tendered return of the leased machines by defendant; otherwise, plaintiff is entitled to no damages in the present action.

7. Each party shall pay its own costs.

A decree may be submitted in conformity herewith.